## DELILAH WELTS *vs.* THE CONNECTICUT MUTUAL LIFE INSURANCE COMPANY.

A policy of insurance upon the life of W., issued on the 17th of September, 1864, contained a proviso or condition that the assured should not enter into any military or naval service, and a further proviso that he should not, without the consent of the insurer, visit those parts of the United States lying south of the thirty-sixth degree of north latitude, between the first days of June and November. At the time of the issuing of the policy, the insurer, in consideration of an extra premium of $50, indorsed on the policy a permit or consent allowing W. to go to any part of the United States south of the thirty-sixth degree of north latitude and reside there, or return, within the term of one year, without prejudice to the policy; provided, and such permit was issued with the understanding, "that the said W. was not insured by said policy against death from any of the casualties or consequences of the war or rebellion, or from belligerent forces, in any place where he may be." W. was killed, in October, 1864, in the state of Tennessee and south of the line of the thirty-sixth degree of north latitude, by a roving band of banditti, thieves and robbers, while he was engaged in rebuilding railroad bridges, and in the employ of the United States government, far in the rear of, and away from, any hostile forces. *Held* that W. having the right to be in the place where he was, when killed, and being engaged in no warlike enterprise, and exposed to no war peril, except such as existed through all the peaceful parts of Kentucky and Tennessee, at the time, the risk he ran was one covered by the permit.

*Held, also,* that the permit was to be construed with reference to the known condition of the country at the time it was given; and that the parties must both be deemed to have known what the ordinary perils were, in the country where the insured proposed to go; and that their contract must be interpreted in the light of that assumption.

Accordingly *held*, in an action upon such policy, that the judge at the circuit properly took the case from the jury and directed them to find a verdict for the plaintiff.

ACTION on a life insurance policy, tried at the Steuben circuit in April, 1866. The defendant, on the 17th of September, 1864, issued a policy to the plaintiff upon the life of Philip J. Welts, her husband, for the sum of $5000. The policy contained, among other things, a proviso or condition that in case the assured should, without the consent of the defendant, indorsed on the policy, enter into any military or naval service whatsoever, (the militia not in active service excepted,) the said policy should be null and void. It contained also the further proviso or condition that in case the assured should, without the consent of the company, indorsed on the policy, visit those parts of the United States, which lie south of the thirty-sixth degree of north latitude, between the first day of June and the first day of November, the said policy was to be void and of no effect. At the time of issuing the policy the defendant, in consideration of an extra premium of $50, made and indorsed on the policy a permit or consent that the assured, Philip J. Welts, might go to any part of the United States, south of the thirty-sixth degree of north latitude, and reside there or return within the period of one year, and providing *"that the said Welts is not insured by said policy against death from any of the casualties or consequences of war or rebellion, or from belligerent forces in any place where he may be."*

The insured went to the state of Tennessee (which is below the thirty-sixth degree of north latitude) immediately after the issuing of the policy and permit, being there at least during the month of October, 1864, and was there engaged in the construction and repair of bridges upon the railroads in possession of, and used by, the government of the United States for solely military purposes, he himself being in the service of, and paid by the United States government. He was killed on the 30th or 31st day of October,

1864, by pistol shots from a party of men on horseback, a portion of whom wore federal uniform, and who after inquiring who was the foreman of the party, and learning that Welts was, killed him. Welts was at the time superintendent of repairs, in charge of constructing bridges on the Edgefield and Kentucky railroad, then used solely for military purposes by the United States; and with him were also engaged a number of other men in the same employment—at work by the month. The assured and the men with him had no connection with any army, and were not armed. They were simply laborers—mechanics. No soldiers there. Four men rode up on horseback and shot the assured, robbed two of the workmen and two citizens of that section, and went away. The party of four were robbers merely, and robbed indiscriminately the people. They came there again about three weeks afterwards and robbed the entire party by taking their pocket books, and also robbed a federal officer dressed in federal uniform, and did not, on either occasion, do or attempt to do any thing else except taking the life of Welts, the first time. The defense interposed was two-fold: That the insured entered into the military service of the United States, and lost his life while in such service. 2d. That the insured lost his life, by a casualty or consequence of war or rebellion, or from belligerent forces, the defendant not being liable for death occasioned by such means or any of them, according to the terms of the permit and policy which formed the contract between the parties.

The defendant did not request the court to submit any question to the jury. The court directed the jury to find a verdict for the plaintiff for the amount of the policy and interest. The defendant's exception was to this direction. Exception ordered to be heard at the general term, in the first instance.

*Bradley & Kendall,* for the plaintiff. I. The exception taken by the defendant to the direction of the court was not

well taken. 1. The defendant did not request the court to submit the case, or any question, to the jury, and can not now insist that the evidence presented any question of fact for the jury. If, therefore, the evidence was sufficient to authorize the jury to find for the plaintiff, if the whole case had been submitted, the verdict will be sustained. (*Lansing* v. *Wiswall*, 5 *Denio*, 213, 215, 218. *Barnes* v. *Perine*, 2 *Kern.* 18, 22. *Winchell* v. *Hicks*, 18 *N. Y. Rep.* 558. *Hunt* v. *Maybee*, 3 *Seld.* 266, 269. *Colemard* v. *Lamb*, 15 *Wend.* 334. *Bidwell* v. *Lament*, 17 *How.* 357.) 2. The evidence was clearly sufficient to authorize the jury to find that the death of the assured was not caused by the casualties or consequences of war or rebellion, or by belligerent forces. They were authorized to find that the persons who killed him were merely thieves, maurauding and plundering, and that they had no connection with any war or belligerent forces. 3. The evidence was not only sufficient to authorize, but to entitle, the plaintiff to the verdict. The defendant having given the consent to the assured to go south of the 36th degree of north latitude, assumed the burden of showing that his death there was occasioned by the casualties or consequences of war or rebellion or by belligerent forces. The affirmative was with the defendant, in this respect. (*Bentley* v. *Bentley*, 7 *Cowen*, 701, 704. *Johnson* v. *Hudson River R. R. Co.*, 5 *Duer*, 21. *Mechanics' Bank. Asso.* v. *Spring Valley*, &c. 25 *Barb.* 420.) This written consent or permit was contemplated by the terms of the original policy, and was made upon an extra consideration of fifty dollars paid. The language employed by the defendant constituting the terms of the proviso in the permit, must be construed so as to have a certain and definite meaning. " That sense will be given to it in which the party making believed the other party to have accepted it." And any doubtful or ambiguous expression will be construed against the party making the instrument, as such party is presumed to have employed the words which would most strongly favor the maker. (*Broom's Legal Max.* 459,

60, 61. *Parsons on Cont.* 18, 19. 4 *Kent's Com.* 557, *4th ed. Mason* v. *Pritchard,* 12 *East,* 228. *Mayer* v. *Isaac,* 6 *M. & W.* 612.) The terms " casualties and consequences," contained in the proviso, must be confined to direct connection with war or rebellion, and such as flow directly therefrom, and may be traced directly thereto, as the immediate cause. (*Web. Dic. Patrick* v. *Am. Ins. Co.,* 11 *John.* 14. *Hulu* v. *Albany Co. Ins. Co.,* 3 *Barb.* 470. *Rice* v. *Homer,* 12 *Mass. Rep.* 230. *Livie* v. *Janson,* 12 *East,* 648.) If it be assumed that the existence of war or rebellion in the south occasioned a disordered state of society and reduced or entirely suspended legal restraint upon evil disposed persons, and enabled thieves, robbers and murderers to wander and commit depredations with impunity, the criminal acts of such persons, or of parties of them, would not be deemed the consequences of war or rebellion, in a legal sense. Who could say that any particular act thus committed was the consequence of war? The same thing may have been done whether war existed or not; although perhaps less frequently if legal authorities, ministerial and judicial, were better organized, so as to produce greater fear of punishment. The fact that war or rebellion existed south of the 36th degree was known to the defendant at the time the policy and permit were made, and the latter was made expressly to authorize the assured to go there without impairing the policy, and in view of the state of society existing there. And if the defendant had designed to confine its liability to case of death of the assured by lightning merely, the limitation might have been so expressed with but little difficulty. The term " casualties," used in the proviso, means merely any accident produced or occasioned directly by war. (*Web. Dic.*) And the term " belligerent forces," also used by the defendant, has and is entitled to a definite and certain meaning, and can apply only to forces engaged in some manner in war, as distinct from commission of crime. In view of these principles the defendant entirely failed to establish the fact that the death of the

Welts *v.* Connecticut Mutual Life Insurance Company.

assured was occasioned by the casualties or consequences of war or rebellion, or by belligerent forces. The assured was not in any manner in the military service. He was in the employ of the government simply as a mechanic. He was not in the region of any military forces. The defendant failed to show that the four men who came there and caused the death of the assured were belligerent forces in any sense, or that they had any sort of connection with the war or rebellion, or that they were acting in aid of any military force. The conduct of the four men failed to indicate that they were guerillas, or a war band. They did not endeavor to drive the workmen away from their work, in which the assured and others with him were engaged. They did not arrest or parole any of them. They did not injure, destroy or carry away any of the tools or implements of the workmen. They did not injure or destroy the work or construction produced by the workmen. They did not interfere with any of the property, except the money which they obtained from the mechanics. They did not say any thing for or against the federal government or those in rebellion. They, in fact, did nothing indicating the character of belligerents. But they did indicate quite sensibly to the workmen what they were. They appeared to be thieves or robbers. They quietly, on the occasion referred to, required some of the mechanics to surrender their pocket books, which they relieved of their contents. They did not give the citizens of the south an opportunity to complain of neglect in that respect; they robbed two of them at the same time. They showed no less respect for federal army officers, although dressed in blue uniform, for they also robbed one of them who happened to be there on that occasion. And to afford no opportunity for doubt as to their true character, they returned about three weeks after, and simply required all the workmen there, numbering about fifteen, to surrender their pocket books, and went away without committing any further depredations or disturbance; they did not even punish those who had no

money, for being short, but in those cases politely returned the empty pocket books.   Their appearance afforded no evidence that they were military forces.   Two of them wore federal overcoats, (a thing common for citizens having no sort of connection with the army,) and two of them in citizen's dress. They were on horseback, had no swords, sabres or guns, except pistols, which might be useful, and are usual weapons for thieves and robbers to carry.   The fact that they shot the assured does not afford any evidence that they were military forces.   Why did they kill him and not shoot the federal officer or any body else ?   The only reason appearing is because he did not obey them when he was asked to come out, or to surrender his pocket book.   They promised the same thing to others whom they robbed, by drawing their pistols and demanding " their money or their lives," which is a common mode of conducting robberies.   This transaction might have taken place without the existence of war, and it furnished no evidence that a state of war did exist any where. 4.  The term " belligerent forces," as used in the permit, must be confined to military forces as such ; and in view of the fact that a state of war or rebellion existed in the south at the time the defendant gave the permit to the assured to go there, it can not well be conceived that it was contemplated that he was required to avoid any other than the active forces engaged in war.   It will not do for the defendant to insist that any person who saw fit to kill and rob was a belligerent, within the meaning of the term used in the permit,   And the difficulty on the part of the defendant of making proof can not aid it.   The defendant, for a consideration, voluntarily made the contract, with all burdens and hazards incident to it.   The defendant, therefore, would not have been entitled to have the evidence submitted to the jury, if a request to do so had been made to the court.   There was no evidence to authorize or support a verdict for the defendant.

II.  The evidence of Walker, to show the declarations of the assured respecting his understanding of the purport of the

written permit, and of the witness Phelps, offered to show the different rates of risk, for the purpose of giving character to the permit in question, were properly excluded. This evidence was not competent to vary the terms of the written instrument. That needed no explanation.

III. The verdict is right on the merits. A new trial ought to be denied.

*Thompson & Mills,* for the defendant. I. Philip J. Welts at the time of his death was in the military service of the United States. He was superintendent, employed by the quartermaster's department of the United States army, in charge of constructing bridges on a line of railroad in the hands of the United States military authorities, used solely in aid of military operations. He was enrolled on the pay rolls of the United States army and was paid by a paymaster of the United States.

II. The court will take judicial notice, (1.) Of the existence of the war and of the rebellion and of its territorial extent, and of the civil divisions of the country and their location and lines of latitude and longitude, and of proclamation for a peace. (1 *Greenl. Ev. pp.* 8, 10, 16.) (2.) That the state of Tennessee was below the line of the thirty-sixth degree of north latitude and at the time of Welt's death was in a state of war or rebellion, and under martial law and the act of habeas corpus suspended therein. This upon two grounds: 1st. The proclamation of the president of the United States so declaring; and 2d. As a matter of public history affecting the whole people. (16 *California R.* 220.) (3.) It will be presumed, in the absence of proof to the contrary, that prior to the existence of war or rebellion in Tennessee, a condition of peace prevailed. (*People* v. *McLeod,* 1 *Hill,* 377.)

III. The policy, and the permit of September 17, 1864, are to be treated and construed together, and the two form the

contract between the parties.    (*Baldwin* v. *New York Life Ins. Co.*, 3 *Bosw.* 530.)

IV. Welts lost his life from the casualties or consequences of war or rebellion.  1. But for the existence of war, his death would not have been occasioned in the manner in which it was. No such band of robbers or guerillas would be abroad, in a time of peace.  It was the lawless state of society which is *a consequence* of war that enabled such bands to prowl about, murdering and robbing whomever they met.  2. At the time of his death Welts was in the employ of the government, on a railroad, the use of which by the government, was made necessary only by reason of the war, and his employment there was a consequence of the war, and his death was a direct consequence of that employment.  3. The band of men who shot Welts were guerillas.  They came on horseback, in the day time, four in number, one in command, and were armed, roaming the country robbing, killing and destroying.  Guerillas or bands of robbers like this do not exist in a time of peace.  They are an outgrowth, a *consequence* of a state of war, and any act of theirs is a consequence of war.  4. The presumption is, that previous to the war and rebellion, parties of men like these were not allowed, nor would dare in open day in a public place, to shoot down a man, as was done in the case of Welts.  Upon this presumption, also, the death of Welts was a direct consequence of the war, whether the parties who caused it were robbers, guerillas or soldiers.  5. It is not necessary that Welts should have been killed in battle, or on a march, to come within the term used in the permit, "casualties or consequences of war."  It is sufficient that his death was in any way caused by or was the result of the war.  (*St. John* v. *Am. Mut. Fire and Marine Ins. Co.*, 11 *N. Y. Rev.* 516. *Tilton* v. *Hamilton Fire Ins. Co.*, 1 *Bosw.* 367.)

V. This band of men were part of the belligerent forces opposed to the government of the United States.  No one friendly to the United States would war upon its defenders.  On one

occasion they came in search of a person wearing federal uniform, and on another they robbed a federal officer, and at the time Welts was killed, the person in command of the party inquired for the foreman of the men, and on learning that Welts was, shot him, during which his companions were robbing the others. The fact of their robbing a "citizen," is no proof to the contrary; as it does not appear whether such citizen was loyal or disloyal to the United States. If loyal, and such is the presumption, that fact furnishes ample reason for their conduct toward him, and tends to prove their belligerent character.

VI. By the permit of September 17, 1863, the defendant only waived the clause in the policy prohibiting the insured from passing below the thirty-sixth degree of north latitude, and the only additional risk they assumed and the extra premium covered, was the effect of the climate upon the health of the insured, below that degree of latitude; in other words, the permit covered only a "climate risk" and none other.

*By the Court*, E. DARWIN SMITH, J. The circuit judge having taken the case from the jury and directed a verdict for the plaintiff, the only question arising upon the exception to such order and decision is, whether there was any evidence in the case sufficient to have warranted a verdict for the defendant.

Upon the facts of the case there is very little room for dispute. The plaintiff's husband was killed in the state of Tennessee, and south of the line of the thirty-sixth degree of north latitude, by a roving band of banditti, thieves and robbers, such as infested all the border states during the war. The death, occurring at such place and under such circumstances, clearly avoids the policy, unless it is covered and saved by the permit or consent indorsed upon the policy, of the date of September 17, 1864.

By this permit Welts was permitted to pass, by the usual route and means of public travel, to any part of the United

States south of the thirty-sixth degree of north latitude, and reside there, or return, during the term of one year from the date of such permit, without prejudice to said policy; provided, and the said permit was issued with the understanding and agreement of the parties in interest, "that the said Welts was not insured by said policy against death from any of the casualties or consequences of the war or rebellion, or from belligerent forces, in any place where he may be." If this permit had not been given when all that part of the United States south of the thirty-sixth degree of north latitude was in a state of insurrection and war, and covered more or less with hostile armies, I should have considered that Welts came to his death from the causes covered by the proviso, and excepted from the policy. But he was permitted to go into any or all the insurrectionary states south of the line of the thirty-sixth degree of north latitude; the insurers well knowing, as well as the assured, of the existence of the war of the rebellion in all of these states. The assured paid an extra premium for such permit. He was killed where, under the permit, he had a right to be. He was not killed by rebels in any encounter of arms. He was engaged in no battle, or near any. He was twenty miles or more in the rear of the United States forces at Nashville, and it does not appear that there was any rebel force at the time north of the Cumberland. He was not exposed to any war peril, except such as existed through all the peaceful parts of Kentucky and Tennessee. Having the right to be in the place in which he was killed, the risk Welts then run was one covered by the permit. He was engaged in no warlike enterprise. He was simply rebuilding railroad bridges far in the rear of, and away from, any hostile forces. The band by which he was killed were, it seems, mere roving robbers, robbing union men and rebels alike. They did not interfere with the work in which Welts was engaged. They did not destroy railroads or bridges, or make prisoners of any persons in Welts' company, or others. They merely robbed the members of the company of their

money, making no demonstrations indicating that they were confederate soldiers, or acting in the interest of the rebel government. It is true that Welts ran the peril of encountering such robbers by going into Tennessee, but this, I think, was part of the risk contemplated by the permit. The same peril would have been encountered if he had been traveling quietly in that section of country, simply passing from one place to another in any part of the United States south of the line of thirty-six degrees of north latitude.

This permit is to be construed with reference to the known condition of the country at the time it was given, and the parties must both be deemed to have known what the ordinary perils were in the country where the insured proposed to go, and their contract must be interpreted in the light of this assumption.

I think, therefore, that the proper disposition was made of the case at the circuit, and that a new trial should be denied, and judgment ordered upon the verdict.

Judgment for the plaintiff.

